Robert V. Cornish, Jr. (Wyo. Bar. No. 6-3898)
LAW OFFICES OF ROBERT V. CORNISH, JR., PC
680 South Cache Street, Suite 100, P.O. Box 12200
Jackson, WY 83001
Office: (307) 264-0535
Email: rcornish@rcornishlaw.com

*Attorney for Mark Sanders, Karen Krywy-Sanders, beneficiary of the Karen Krywy-Sanders IRA, Chad Beebe, Matthew C. Motsko, Dewayne Cothron and WD60 LLC (the "Tennessee Norada Plaintiffs")*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| MARK SANDERS, KAREN KRYWY-SANDERS, beneficiary of Karen Krywy-Sanders IRA, CHAD BEEBE, MATTHEW C. MOTSKO, DEWAYNE COTHRON and WD60 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>NORADA CAPITAL MANAGEMENT LLC; NORADA EQUITY INC.; NORADA CAPITAL ECOMMERCE FUND I LLC; NORADA CAPITAL CRYPTO FUND I LLC; NORADA THEATRICAL PRODUCTIONS LLC; NORADA REAL ESTATE FUNDING LLC; and NORADA CAPITAL REAL ESTATE FUND I, LLC,<br><br>Defendants. | Case No. 1:26-cv-00089<br><br>**COMPLAINT**[1]<br><br>**JURY TRIAL REQUESTED** |

[1] This Complaint should be deemed an Amended Complaint for Plaintiffs Mark Sanders, Karen Krywy-Sanders, beneficiary of the Karen Krywy-Sanders IRA, and Chad Beebe who were Plaintiffs in the most recent submission dismissed by the United States District Court for the District of Wyoming pursuant to the Order entered in Case No. 2:25-cv-00062-ABJ at ECF No. 100.

COME NOW Mark Sanders, Karen Krywy-Sanders, beneficiary of Karen Krywy-Sanders IRA, Chad Beebe, Mattew C. Motsko, Dewayne Cothron and WD60 LLC (the "Tennessee Norada Plaintiffs"), by and through their attorneys, Law Offices of Robert V. Cornish, Jr., P.C., and for their Complaint state and allege as follows:

**PRELIMINARY STATEMENT**

1. The Tennessee Norada Plaintiffs invested $1,805,000 in the aggregate in promissory notes issued by Defendant Norada Capital Management (the "Notes"). The foundation of the Notes was supposedly a diverse pool of profitable companies whose investment returns were touted to outperform the stock market and beat inflation.

2. While Norada Capital Management portrayed these investment holdings as promising and lucrative, none of the holdings were ever producing the cash that was required for Norada Capital Management to pay interest on the Notes.

3. Instead, they were speculative companies subject to the financial whims of Marco Santarelli, who presented himself as a seasoned investor when in fact he was an utter failure. Santarelli failed to disclose to Tennessee Norada Plaintiffs his prior bankruptcy filings on behalf of himself and his company 360 Enterprises d/b/a Norada Real Estate, and prior violations of Pennsylvania and California state securities laws.

4. What resulted was a classic Ponzi scheme. To maintain the Ponzi scheme, investments from new investors in the Notes were used to generate the monthly interest payments promised to other existing investors in the Notes. Santarelli wasted whatever was left. Making matters worse was that some of the base investments ultimately approved by Santarelli for the Tennessee Norada Plaintiffs and others were in fact Ponzi schemes themselves.

5. Through this scheme, Norada Capital Management is believed to have obtained at

least $60 million from deceived investors who are now left holding its worthless equity.

6. The Tennessee Norada Plaintiffs are among those investors and come before this Court seeking damages from the Wyoming Norada Defendants.

**PARTIES**

7. The Tennessee Norada Plaintiffs are as follows:

a. Plaintiff Mark Sanders is an individual residing in Hendersonville, Tennessee.

b. Plaintiff Karen Krywy-Sanders, beneficiary of the Karen Krywy-Sanders IRA is an individual residing in Hendersonville, Tennessee.

c. Plaintiff Chad Beebe is an individual residing in Franklin, Tennessee.

d. Plaintiff Matthew C. Motsko is an individual residing in Knoxville, Tennessee.

e. Plaintiff Dewayne Cothron is an individual residing in Lebanon, Tennessee.

f. Plaintiff WD60, LLC is a Tennessee limited liability corporation with its principal place of business in Lebanon, Tennessee. Dewayne Cothron is its Manager.

8. Defendant Norada Capital Management LLC ("Norada Capital") is a Wyoming limited liability company with a principal place of business at 30251 Golden Lantern, Suite E361, Laguna Niguel, California 92677. Norada maintains a registered agent at Republic Registered Agent LLC, 5830 East 2nd Street, Suite 7000, Casper, Wyoming 82609. Norada Capital is a purported investment management company but is not registered with any regulatory body as such.

9. Defendant Norada Equity Inc. ("Norada Equity") is a Wyoming for-profit corporation, with a principal office located at 30251 Golden Lantern, Suite E361, Laguna Niguel,

California 92677. Norada Equity is purportedly an investment management company. On information and belief, Norada Equity has one sole Officer and Director: Marco Santarelli. Norada Equity is in good corporate status with the State of Wyoming. Norada Equity maintains a registered agent c/o Republic Registered Agent LLC, 5830 East 2nd Street, Suite 7000 Casper, Wyoming 82609. Component investments of the Notes were held by Norada Equity.

10. Defendant Norada Capital Ecommerce Fund I, LLC ("Norada Ecommerce") is a limited liability company duly incorporated in Wyoming, with a principal office located at 2232 Dell Range Boulevard, Suite 200, Cheyenne, Wyoming 82009. Defendant Norada Ecommerce purports to be an investment management company. On information and belief, Norada Ecommerce has one sole Managing Member: Marco Santarelli. Norada Ecommerce is in good corporate status with the state of Wyoming. Norada Ecommerce has filed one Form D with the Securities and Exchange Commission dated July 24, 2024. CIK#: 0002019397, File No. 021-519638. This notice indicated "First Sale Yet to Occur". Component investments of the Notes were held by Norada Ecommerce.

11. Defendant Norada Capital Crypto Fund I, LLC ("Norada Crypto") is a Wyoming limited liability company, with a principal office located at 2232 Dell Range Blvd, Suite 200, Cheyenne, Wyoming 82009. Defendant Norada Crypto is a purported investment management company. On information and belief, Norada Crypto has one sole Managing Member: Marco Santarelli. Norada Crypto is in good corporate status with the State of Wyoming. Component investments of the Notes were held by Norada Crypto. On information and belief, Norada Crypto maintains an account with Coinbase which holds some or all of its digital assets.

12. Defendant Norada Theatrical Productions LLC ("Norada Theatrical") is a Wyoming limited liability company with a principal office located at 30251 Golden Lantern, Suite

E361, Laguna Niguel, California 92677. Defendant Norada Theatrical also purports to be an investment management company. On information and belief, Norada Theatrical has one sole Managing Member: Marco Santarelli. Norada Theatrical is in good corporate status with the State of Wyoming. Component investments of the Notes were held by Norada Theatrical.

13. Defendant Norada Real Estate Funding LLC ("Norada Real Estate Funding") is a Wyoming limited liability company with a principal office located at 30251 Golden Lantern, Suite E361, Laguna Niguel, California 92677. Defendant Norada Real Estate Funding projects itself as an investment management company concentrating on real estate investments. On information and belief, Norada Real Estate Funding has one sole Managing Member: Marco Santarelli. Norada Real Estate Funding is in good corporate status with the State of Wyoming. Component investments of the Notes were held by Norada Real Estate Funding.

14. Defendant Norada Capital Real Estate Fund I, LLC ("Norada Capital Real Estate") is a limited liability company incorporated in Wyoming, with a principal office located at 2232 Dell Range Boulevard, Suite 200, Cheyenne, Wyoming 82009. Defendant Norada Capital Real Estate is an investment management company concentrating in real estate. On information and belief, Norada Capital Real Estate has one sole Managing Member: Marco Santarelli. Norada Capital Real Estate is in good corporate status with the State of Wyoming. Component investments of the Notes were held by Norada Capital Real Estate.

15. All Defendants collectively known as the "Wyoming Norada Defendants."

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over each of the Wyoming Norada Defendants because frauds were perpetrated through one or more Wyoming corporations. To the extent not otherwise provided, jurisdiction of this Court over each and every Defendant may be invoked

through Wyoming's long-arm statute.

17. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because the Tennessee Norada Plaintiffs assert claims arising under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Tennessee Norada Plaintiffs' related state-law claims because those claims arise from the same nucleus of operative facts as the federal securities claims, including the solicitation, issuance, marketing, and administration of the promissory notes at issue and the subsequent suspension, conversion, and nonpayment of amounts owed to the Tennessee Norada Plaintiffs.

19. Venue is proper in the District of Wyoming pursuant to 28 U.S.C. § 1391(b)(1) because all of the Defendants are incorporated in Wyoming.

## BACKGROUND ON NORADA CAPITAL

20. Defendant Norada Capital and its principal Marco Santarelli are each unregistered as brokers, dealers, or investment advisers under both federal law and the laws of the State of Tennessee. Norada Capital and Santarelli are in the business of sponsoring, marketing, and managing unregistered securities offerings to the public in the form of the Notes. According to Norada Capital, its role is to provide investors with "promissory note investments that generate predictably monthly income" so investors "don't have to chase the volatility and unpredictable returns offered by the stock market."

21. Instead, Santarelli, with the active assistance of his fellow officers and directors, utilized the Notes and the other Wyoming Norada Defendants under his control to concoct and manage a Ponzi scheme.

22. Defendant Norada Capital served as the front company, to which investors transferred their funds under the guise of a legitimate investment. The other Wyoming Norada Defendants were the supposed "investment vehicles" of the Notes through which returns were to be provided.

23. On or about November 30, 2020, Defendant Norada Capital, filed a Form D with the United States Securities and Exchange Commission ("SEC"), pursuant to Rule 506(c) of Regulation D. Under Regulation D, companies are permitted to offer and sell securities without SEC registration provided that certain conditions are met, including the absence of any disqualifying "bad actors."

24. However, Defendant Norada Capital's "investor deck," which the Tennessee Norada Plaintiffs received prior to their investments, names Ronald Fossum ("Fossum"), CRD #3194203 as the company's Chief Financial Officer (CFO). Fossum is a former investment fund manager who was convicted on or about June 17, 2018 of "misappropriating hundreds of thousands of dollars of investor funds he raised through unregistered securities offerings of three investment funds he owned and controlled." *SEC v. Ronald A. Fossum, Jr. and Alonzo R. Cahoon,* No. 2:17-cv-01894 (W.D. Wash., Filed Dec. 19, 2017).

25. As a result of Fossum's conviction, the SEC indefinitely barred him from acting as a broker or investment advisor or otherwise associating with firms that sell securities or provide investment advice to the public and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal account. *Id.*

26. Fossum's prior conviction and permanent bar by the SEC render him a "bad actor" per the applicable SEC regulations and parallel regulations in Wyoming.

27. Therefore, Defendant Norada Capital was prohibited from claiming a Regulation

D exemption because the presence of a disqualified individual triggered the "bad actor" disqualification under Rule 506(c). Importantly, Santarelli personally signed and certified the accuracy of Defendant Norada Capital's Form D filing, asserting that no exceptions or disqualifications applied. Given that Defendant Norada Capital's CFO is a "bad actor" pursuant to Rule 506(c) of Regulation D, Santarelli's attestation that any of the Wyoming Norada Defendants were eligible to claim a Regulation D exemption from registration was materially false and misleading. Thus, any claims that Norada Capital or others may make regarding reliance on private securities offering exemptions either federally or under Tennessee law are void as a matter of law.

28. In 2007, Santarelli's former company, 360 Enterprises d/b/a Norada Real Estate, filed for bankruptcy in the U.S. Bankruptcy Court, Central District of California. *See In re 360 Enterprises*, Petition Number 8:07-bk-12868-RK. This fact was never disclosed to the Tennessee Norada Plaintiffs in the placement of the Notes.

29. In 2008, Santarelli filed for bankruptcy in the U.S. Bankruptcy Court, Central District of California, and had his debts discharged. *See In re Marco Santarelli,* Petition Number 8:08-bk-13931-RK. This fact was never disclosed to the Tennessee Norada Plaintiffs in the placement of the Notes.

30. In June 2011, the Pennsylvania Securities Commission issued a Cease-and-Desist Order, finding Santarelli violated Pennsylvania state securities laws by offering unregistered securities to a non-accredited investor and failing to disclose his bankruptcy filing and debt discharge as well as 360 Enterprises d/b/a Norada Real Estate's bankruptcy filing.

31. As a result of this conduct in Pennsylvania, on June 13, 2012, the California Department of Corporations also issued a Cease-and-Desist Order against Santarelli, Cash Flow Management, LLC, and Cash Flow Energy Fund, LLC, ordering they refrain from the further offer

or sale of securities in California, unless and until qualification was made under California law or unless exempt. This fact was never disclosed to the Tennessee Norada Plaintiffs in the placement of the Notes.

## THE NOTES SCAM BEGINS

32. Defendant Norada Capital utilized numerous marketing materials and channels, including a publicly accessible website, to perpetuate its Ponzi scheme. From at least as early as May 2021 through August 2024, Norada began distributing to the Tennessee Norada Plaintiffs and others marketing materials offering "predictable income with promissory notes" and "monthly passive income with interest of 15% or more" (the "Notes"). Defendant Norada Capital stated that investment objectives for the Notes were to provide "rates of return that are higher than banks, traditional low yield bonds, and higher than most stock dividends." Defendant Norada Capital also offered the Notes as a way for investors to "use their self-directed traditional IRA or Roth IRA. We can recommend several custodian companies that handle the paperwork and hold your IRA while the funds are invested with us." *See* ***Exhibit "1"*** ("Predictable Income with Promissory Notes") and ***Exhibit "2"*** ("Norada Capital Fund Predictable Passive Income with Promissory Notes") (collectively, the "Marketing Materials").

33. Santarelli, purportedly speaking on behalf of Defendant Norada Real Estate as its agent to falsely imply the safety of real estate investments to the Notes, also publicly promoted investments in the Notes on its YouTube channel.[2]

---

[2] Norada Real Estate Investments, *How to Earn 15% Interest and Beat Inflation with Promissory Notes (Norada Capital Management)*, YOUTUBE (Jan. 20, 2023), https://www.youtube.com/watch?v=XZvLUd7qMPk

34. Investors in the Notes, such as the Tennessee Norada Plaintiffs, were offered terms ranging from 3-7 years, a 12% - 17% interest rate depending on the principal amount invested, and a possible 5% "bonus rate" if $200,000.00 or more was invested. Norada Capital stated that it sought "stable and high-income opportunities with capital preservation. A second objective is to take advantage of opportunities with good capital appreciation potential."




35. Notably, Defendant Norada Capital stated that interested persons in the Notes "need to be an accredited investor as defined by the SEC."

36. Several of Defendant Norada Capital's flyers distributed to the Tennessee Norada Plaintiffs also stated that its current holdings underlying the Notes fell into three categories and listed various company names as follows:

a) E-Commerce Business
  i. Pier 1
  ii. Linens n Things
  iii. Ralph & Russo
  iv. Dressbarn
  v. Stein Mart
  vi. Roland Mouret
  vii. Modell's Sporting Goods

viii. Bodybuilding.com
ix. The Franklin Mint
x. Farmerscart
xi. MentorBox
b) Real Estate and Other Businesses
i. BRD Land & Investment
ii. Imagination Vacation Rentals
c) Media Businesses
i. InPickleball Media
d) Theatrical Businesses
e) Crypto Assets
i. Bitcoin
ii. Solana

This flyer is annexed hereto and incorporated by reference to this Complaint as ***Exhibit "1,"*** *supra.*

37. A marketing publication that Defendant Norada Capital utilized from at least August 2022 through August 2024 and distributed to the Tennessee Norada Plaintiffs advertised that 55.3% of the purported asset allocation of Norada Capital's current holdings once classified as real estate investment were actually in so-called "Mastermind Businesses," including Aspire, Money is, and Level Up, the securities of which were held by one or more of the Wyoming Norada Defendants. On information and belief, these businesses were controlled by non-party Aspire Events.

38. Aspire Events' manager was Collective Equity, whose officers and directors non-parties Andrew Cordle and Eddie Wilson were represented to be serving as senior advisors to Santarelli and Norada Capital.

39. On information and belief, Cordle and Wilson confronted Santarelli regarding the use of their names in Defendant Norada Capital's marketing materials, as they denied serving as advisors to Norada Capital as was stated to the Tennessee Norada Plaintiffs and other investors. This fact was never disclosed to the Tennessee Norada Plaintiffs by anyone. In fact, the marketing materials utilized by Norada Capital continued to represent Cordle and Wilson as senior advisors.

Dependent upon Santarelli directing funds of Norada Capital to their venture, it appears that Cordle and Wilson either acceded to these representations or did nothing further to stop them. In a webinar with Santarelli, Wilson confirmed that Norada Capital invested in at least some of the Mastermind entities and Norada Capital owned 1/3 of Money Is.[3]

40. In the above-referenced marketing materials distributed by Norada Capital to prospective and existing investors were the following cash flow projections for these underlying investments:

# CASH FLOW PROJECTIONS

Four-year cash flow projections based on current asset allocation and distribution projections:

| | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|
| Gross Revenues | $23,882,800 | $36,882,800 | $38,122,800 | $44,562,800 |
| Interest Expenses | -$9,615,000 | -$7,515,000 | -$4,215,000 | -$465,000 |
| Operating Expenses | -$450,000 | -$300,000 | -$300,000 | -$300,000 |
| Note Surplus / Payoffs | $8,000,000 | -$8,000,000 | -$16,000,000 | -$22,000,000 |
| | | | | |
| **NET CASH FLOW:** | **$21,817,800** | **$21,067,800** | **$17,607,800** | **$21,797,800** |

Updated January 1, 2024

Statements made herein includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 which represent our expectations or beliefs concerning future events that involve risks and uncertainties, including those associated with our ability to obtain financing for our current and future operations. All statements other than statements of historical facts included in this presentation including are forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we cannot assure you that such expectations will prove to have been correct. You should always consult your own independent tax or legal professionals or advisors prior to making any investment, including this one. Important factors that could cause actual results to differ materially from our expectations ("Risk Factors") are disclosed in a Private Placement Memorandum, including without limitation, in connection with the forward-looking statements included in the Memorandum. All subsequent written and oral forward-looking statements attributable to us or persons acting on its behalf are expressly qualified in their entirety by the Risk Factors.

41. On information and belief, these "revenue projections" were never founded on commercially reasonable or even legitimate financial data of "thriving companies" in the "fund's portfolio," and were known as much by the Wyoming Norada Defendants, which had deployed the money of investors in the "thriving companies." The Wyoming Norada Defendants knew that had they actually utilized financial projections that were commercially reasonable or accurate, the rates of return would likely be minimal or negative and the Ponzi scheme therefore revealed.

---

[3] Norada Real Estate Investments, Mastermind Business with Eddie Wilson, CEO of Aspire | Norada Masterclass 11.17.23, YOUTUBE (Nov. 22, 2023), https://www.youtube.com/watch?v=tT1BzdDbdSc&t=1171s.

42. On information and belief, these "revenue projections" were also known to the Wyoming Norada Defendants as inaccurate because they knowingly hired an inexperienced bookkeeper to maintain their respective financial records. On behalf of the Wyoming Norada Defendants, Santarelli and Fossum hired such an inexperienced bookkeeper to provide plausible deniability for the commercially unreasonable projections they orchestrated to further their Ponzi activities.

43. Defendant Norada Capital distributed a fake balance sheets to then current and prospective investors in May 2023 onward that claimed the Mastermind Businesses had total assets of $113.4 million. Again, the Wyoming Norada Defendants each knew that these balance sheets were inaccurate and thus false and misleading each time they were distributed to current and prospective investors in the Notes.

44. Cordle and Wilson knew about the precarious financial positions of the Mastermind Businesses by virtue of their insider status as to operations (or lack thereof) of these entities. The purpose of the false and misleading information communicated from these individuals to then-current and prospective investors in the Notes by the Wyoming Norada Defendants was to suppress potential redemptions so that more assets could be gathered to continue illicit Ponzi activities in the Notes and, as to Santarelli, fund his extravagant personal spending.

45. At all relevant times, the Wyoming Norada Defendants failed to warn or disclose to investors, including the Tennessee Norada Plaintiffs, Santarelli's prior business failures, bankruptcy filings, debt discharge, prior findings that he violated state securities laws in his previous investment ventures and other business irregularities to which they were privy.

46. These failures by Defendant Norada Capital to disclose such information were intentional, as revealing Santarelli's past questionable conduct would have shattered his on-line

persona as an investment savant worthy of entrustment of tens of millions of dollars for investment. In fact, the theatrical investments touted by Santarelli that were used to lure the Tennessee Norada Plaintiffs and other investors to purchase Notes were nominal and meaningless in light of the overall Ponzi scheme. Defendant Norada Capital also represented that an investor's principal "is automatically returned to [his/her] funding account upon the maturity of [his/her] Note. [Investor has] the option to reinvest your principal if additional investment opportunities are available at that time." ***Exhibit "2."***

47. These statements were false when made and known to be false by the Wyoming Norada Defendants, given that they in fact did not maintain segregated "accounts" such as a "funding account" for the return of capital. This is because no such capital could ever be lawfully returned to investors in the Notes because the underlying companies held by the Wyoming Norada Defendants were not generating profit and investors' money was commingled and utilized by Santarelli and Fossum to conduct Ponzi activities.

48. In its marketing materials provided to the Tennessee Norada Plaintiffs, Defendant Norada Capital emphasized the passive, hassle-free nature of investment in the Notes by stating that "[O]ur notes are ideal for passive investors seeking to add and diversify their income streams. Interest payments are deposited monthly via ACH, making it a truly hands-off passive investment." *See* ***Exhibit "2,"*** *supra.*

49. Since the inception of the Notes, on information and belief, the Wyoming Norada Defendants accumulated millions of dollars from dozens of investors through the numerous false and misleading statements in the marketing materials for the Notes, all supported by a "boiler room" like sales staff that could conveniently feign ignorance to the funds of investors being frittered away. This investor capital for the Notes funded, among other things, compulsive

spending by Santarelli in consumer goods and other non-investment activities, which on information and belief exceeded 4,000 transactions per month—or one transaction every 12 minutes of each day—on at least one credit card. It can be said that Santarelli's management of the underlying investments and corporate affairs of the Wyoming Norada Defendants was not his main priority.

50. Crucial to the conduct of the overall Note fraud of was the "investor deck" utilized by Defendant Norada Capital from at least September 2022 through August 2024, on which the Tennessee Norada Plaintiffs relied upon or to which they had access. First and foremost, the "investor deck" omits any reference to Fossum and thus the registration status of the Notes being in violation of the state and federal laws. These omissions induced potential investors to believe that the Defendant Norada Capital's management had no "bad actors" under Rule 506(c) of Regulation D. Moreover, the "investor deck" contained false, fabricated, and misleading statements regarding the profitability of the Notes, the financial success of the underlying companies and the stability of the "portfolio," all of which induced the Tennessee Norada Plaintiffs to purchase or continue holding the Notes.

51. These false and misleading statements, all of which were reviewed, edited, approved and caused to be distributed by the Wyoming Norada Defendants to the Tennessee Norada Plaintiffs, include but are not limited to the following statements:

A. *"Norada Capital provides investors with promissory note investments that generate predictable monthly income and double-digit returns from 12% to 15%."*

This statement was false when made by Defendant Norada Capital to the Tennessee Norada Plaintiffs because the Notes were not generating these returns, the Wyoming Norada Defendants knew they were not generating such returns, and had no reasonable expectation of ever generating such returns given the lack of internal controls and misuse of investors' funds. The intent of this

statement was to deceive and mislead investors into believing that the Wyoming Norada Defendants were together prosperous and worthy of investment, when in fact no reasonable investor would ever invest anything in any of them had the truth been disclosed.

> *B. "Our fund's portfolio is made up of viable business assets that we work to grow and scale. Our notes are ideal for passive investors seeking to add and diversity their income streams. Interest payments are deposited monthly via ACH, making it a truly hands-off passive investment."*

This statement was false when made by Defendant Norada Capital, and thus, the Wyoming Norada Defendants, because the underlying companies were not viable, not growing, and had no income stream that could possibly pay the interest rates promised. Further, there was in fact no "interest" to be deposited monthly, as any such funds classified as "interest" were in fact Ponzi-type payment proceeds. The intent of this statement was to deceive and mislead investors such as the Tennessee Norada Plaintiffs into believing that the Wyoming Norada Defendants were a prosperous group of companies venture worthy of investment when in fact no reasonable investor would ever invest had the truth of its underlying affairs been disclosed.

52. Defendant Norada Capital induced the Tennessee Norada Plaintiffs to purchase notes by making the following misrepresentations about the opportunity to invest in the Notes

> A. HIGH GROWTH—We underwrite portfolio assets with high capital growth potential as the firm retains those gains on its balance sheet as a private equity firm.
> B. HIGH CASH FLOW— We underwrite portfolio assets with high cash-flow or future cash-flow potential.
> C. CAPITAL PRESERVATION- We underwrite portfolio assets with strong capital preservation potential.

***Exhibit "1"*** at 4.

53. There were no gains on Norada Capital's component investments to retain. No reasonable analyst would consider Norada Capital's assets as having the potential for any growth

that would support the returns promised by the Notes.

54. No reasonable analyst would consider Norada Capital's assets as having the potential for high cash flow, or any meaningful cashflow whatsoever.

55. "Strong capital preservation potential" was a misleading statement when made, as the assets themselves were speculative and did not have potential for capital preservation. Further, the term "capital preservation" is a term of art for the use of fixed income instruments to forgo market returns. Its use here was misleading as it implied the safety of fixed income securities.

**THE INVESTMENTS**

56. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff Mark Sanders on behalf of the Wyoming Norada Defendants on or before September 28, 2023, Mark Sanders for his IRA purchased a Note on September 28, 2023. The Note had the following terms:

- $50,000.00 principal amount;
- 12% per year annum interest; and
- 3-year maturity date

57. Sanders did not verify his status as an accredited investor until after he already purchased the Note.

58. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff Karen Sanders on behalf of the Wyoming Norada Defendants on or before December 18, 2023, Karen Krywy-Sanders for he IRA purchased a Note on December 18, 2023. Karen Sander's Note in her IRA bore the following terms:

- $200,000.00 principal amount;
- 15% per year annum interest;

- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note on or before the Maturity Date

59. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff Chad Beebe on behalf of the Wyoming Norada Defendants on or before December 26, 2022, Beebe purchased a Note on December 26, 2022. The Note had the following terms:

- $100,000.00 principal amount;
- 15% per year annum interest; and
- 3-year maturity date

60. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff Matthew C. Motsko on behalf of the Wyoming Norada Defendants on or before September 1, 2023, Motsko purchased a Note on September 1, 2023. The Note had the following terms:

- $100,000.00 principal amount;
- 15% per year annum interest; and
- 3-year maturity date

61. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff Dewayne Cothron on behalf of the Wyoming Norada Defendants on or before [sic] "September [__], 2023," Cothron purchased a Note. The Note had the following terms:

- $200,000.00 principal amount;
- 17% per year annum interest; and

- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note on or before the Maturity Date.

62. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided by Norada Capital to Plaintiff WD60, LLC on behalf of the Wyoming Norada Defendants on or before September 1, 2023, WD60, LLC purchased a Note. The Note had the following terms:

- $155,000.00 principal amount;
- 17% per year annum interest; and
- 3-year maturity date

63. On or about December 28, 2023, Cothron purchased a $1,000,000 note bearing the same or similar terms as the other notes purchased in September 2023.

**FAILURES TO DISCLOSE**

64. From at least October 5, 2022 through August 12, 2024, the Wyoming Norada Defendants either failed to disclose or caused failures to disclose to its current and prospective investors, including but not limited to the Tennessee Norada Plaintiffs, that they were each a component of a Ponzi scheme, that financial information regarding component investments was known by principals and control persons of the Wyoming Norada Defendants to be false or misleading, and that there was insufficient income and returns to pay the interest that was promised.

65. From at least August 31, 2023 through August 12, 2023, Norada Capital and Santarelli failed to disclose to current and prospective investors in the Notes that the Wyoming Norada Defendants were components of a Ponzi scheme, that financial information regarding its component investments was known by the Wyoming Norada Defendants to be false or misleading,

and that there was insufficient income and returns to pay the interest that was promised due to the misuse of funds by Santarelli.

66. In a September 2023 webinar to which the Tennessee Norada Plaintiffs were invited to attend or view at their leisure, Defendant Norada Capital claimed the Mastermind Businesses—where a majority of Norada Capital's investments were deployed and controlled by Santarelli —were experiencing a 45% profit margin.[4] On information and belief, Norada Capital at this time had not invested funds in the Mastermind Businesses to the extent stated despite promises to do so.

67. The lies continued unabated. From at least September 28, 2023 through August 12, 2024, the Wyoming Norada Defendants continued their charade in failing to disclose to any current or prospective investors in the Notes that they were operating as a Ponzi scheme and that financial information regarding component investments was known by each of them to be false or misleading, that there was insufficient income and returns to pay the interest or "bonus payments" that were promised to holders of the Notes, and that there was no reasonable basis to believe that such income could or would be generated in the future to meet such obligations.

68. From at least February 7, 2024 through August 12, 2024, the Wyoming Norada Defendants continued to conceal from current and prospective investors in Norada Capital that it was operating as a Ponzi scheme facilitated through each one of the Wyoming Norada Defendants, that financial information regarding component investments of the Notes were known to be false or misleading, and that there was insufficient income and returns to pay the interest and "bonus payments" that were promised to holders of the Notes, and that funds that were purported to be invested in component companies had not been invested to the extent stated, if at all.

---

[4] Marco Interview: Why I Love Investing in Mastermind Businesses, NORADA CAPITAL MANAGEMENT go.noradacapital.com/mastermind (last visited March 2, 2025).

69. By the end of April 2024, with little income generated from any investments supposedly made on behalf of holders of the Notes, the Wyoming Norada Defendants needed to quickly garner assets from new investors to pay existing interest and bonus payments at the risk of the Ponzi scheme collapsing. In order to gather these funds and prevent withdrawal requests, the lies and misstatements grew exponentially in order to meet their illicit fundraising objectives.

70. By June 2024, the Ponzi scheme was on the verge of collapse. But that did not stop Defendant Norada Capital from gathering more money from unsuspecting investors. From April 23, 2024 through August 12, 2024, Norada Capital still (a) concealed from its current and prospective investors in the Notes that it was operating as a Ponzi scheme, that (b) financial information regarding component investments held in the Wyoming Norada Defendants were known to be false or misleading, and (c) that there was insufficient income and returns to pay the interest and "bonus payments" that were promised to holders of the Notes.

71. And while the Wyoming Norada Defendants will no doubt seek to use the Private Placement Memorandum (PPM) of Norada Capital as a shield from liability to the Tennessee Norada Plaintiffs and other investors, it appears that not all investors received the PPM and thus were provided with virtually no risk disclosures at all. The Tennessee Norada Plaintiffs are aware of others did not receive any copy of the PPM prior to investing at all. The lack of uniformity in the delivery of disclosure documents to investors in the Notes was indicative of a lack of internal control among the Wyoming Norada Defendants.

72. There is also a plethora of common badges of fraud. For example, at the time of each of the Tennessee Norada Plaintiffs' investments, Norada Capital failed to disclose the fact that (a) Santarelli previously filed for bankruptcy and had his debts discharged in 2008; (b) Santarelli was previously subject to a cease and desist order from the Pennsylvania Securities

Commission in June 2011 for violating Pennsylvania state securities laws by offering unregistered securities to a non-accredited investor and failing to disclose his bankruptcy filing and debt discharge; and (c) Santarelli's previous company 360 Enterprises d/b/a Norada Real Estate also filed for bankruptcy.

73. Further, operative language of the Tennessee Norada Plaintiffs' Promissory Notes provided that a default occurs when Norada Capital fails to make any payment required under the Promissory Note and such period of non-payment continued for more than a period of time ranging from 10-30 calendar days after notice from the Tennessee Norada Plaintiffs. The operative language further states that

> If a Default exists, Maker agrees to provide Holder with shares and/or warrants equal to the principal amount of this Promissory Note should there be a default lasting **more than three (3) months from the month of the default**. Maker reserves the right to buy back said shares and/or warrants by paying off (satisfying) the Promissory Note's outstanding principal in full during the term of the Note.
>
> (emphasis added).

74. Norada Capital made some payments on the Tennessee Norada Plaintiffs' Notes through the First Quarter of 2023 (for those who held them) and then sporadically. The payments then completely stopped in June 2024.

**<u>THE NOTES SCAM UNRAVELS</u>**

75. On June 13, 2024, Norada Capital continued to seek investments in the Notes in a YouTube webinar to which the Tennessee Norada Plaintiffs were invited or asked to view at their leisure. At this time, Norada Capital continued to tout an investment in the Notes as "well-diversified."[5]

[5] Ask Marco Anything | Norada Webinar 6.11.24, Norada Capital Management, YOUTUBE, https://www.youtube.com/watch?v=nNSXcXQXucQ (last visited March 2, 2025).

76. In the June 13, 2024 YouTube webinar, Santarelli on behalf of the Wyoming Norada Defendants continued to discuss the purported continued success of the Mastermind Businesses — component investments of the Notes — which were in fact not successful to a degree sufficient to support their double-digit interest payments because Norada Capital failed to even deliver the capital it promised them.

77. During the June 13, 2024 webinar, one listener asked what would happen if Norada Capital converted the note to equity and how they would gain interest back. On behalf of Norada Capital, Santarelli responded that such a conversion "is actually to your benefit believe it or not because you actually can and probably will end up making more money by us exercising that option to convert your note into equity and then buying it back later with valuations going up on this . . . ." Santarelli affirmatively stated "None of our businesses are suffering." "As the notes mature, we are just going to pay off the notes." Nothing could have been further from the truth. To the contrary, the Ponzi scheme of the Wyoming Norada Defendants was becoming unraveled.

78. For example, on his podcast "Passive Real Estate Investing," in June 2024, Santarelli on behalf of Norada Capital continued to offer and advertise 12-15% interest paid monthly as distributions on the Notes.

79. Only one week after this promotional webinar, on June 20, 2024, Santarelli on behalf of Norada Capital emailed each of the Tennessee Norada Plaintiffs stating that Defendant Norada Capital would be suspending distribution payments on their Notes and converting their Notes into equity (membership interests) in Norada Capital.

80. The e-mail included the following language:

> As with all businesses, Norada is subject to market factors that could impact its ability to make payments. Due to current market conditions and unforeseen financial challenges, we have decided to temporarily suspend distribution payments. This decision was not made lightly and comes after

> thorough deliberation and analysis of our current financial position.

81. This statement was false and misleading when made, as market conditions had nothing to do with the inability of the Wyoming Norada Defendants to cause repayment of the Notes to investors such as the Wyoming Norada Investors. The intent of this statement was to lull investors, including but not limited to the Wyoming Norada Investors, believing that the underlying investments had value when in fact they had little or none to speak of, and that somehow the Notes converted into equity would be reconverted since the suspension of interest payments was "temporary."

82. The e-mail also stated:

> This *requires us* to exercise our right to convert your Note and issue equity (aka membership interests) in Norada. (emphasis added) You will recall that your Note allows Norada to convert the outstanding balance owed into equity and that it can redeem that equity in the future by repayment of the Note principal in full. There is nothing required by you related to your Note being converted. It happens automatically upon notice being sent.

83. This statement was false when made, as there was no requirement that Norada Capital was obligated convert its debt obligations to equity.

84. The email continued:

> As such, this email will provide you notice that Norada has chosen to exercise its right under the Note §6 to issue equity to you in Norada. Your equity is valued at the unpaid face value of the Note plus any accrued but unpaid interest. We expect to be in a position to redeem your interests in short order, and we will keep you posted, as always, on any developments in this regard.

85. This statement was false when made because the equity into which the debt obligations were converted were virtually worthless, thus rendering the valuation of equity wholly inaccurate and misleading.

86. The e-mail continued:

> We understand the importance of distributions to our investors and

> recognize the impact this decision may have on your financial planning. Please be assured that this suspension is temporary. We are committed to resuming regular distributions as soon as our financial situation stabilizes and improves.
>
> Our primary goal is to ensure the long-term stability and sustainability of our business. By temporarily halting distributions, we can preserve capital, manage our resources more effectively, and invest in key areas that will drive future growth and profitability.

87. This statement was misleading when made as there was little or no capital to preserve, no further money to deploy, and that management of its business was essentially ending a Ponzi scheme. *See* ***Exhibit "3"*** ("Notice of Note Conversion").

88. The omissions, lies and half-truths emanating from the Wyoming Norada Defendants continued unabated. Investors were allegedly now invested as equity shareholders in Norada Capital. Norada Capital promised investors "You now stand to benefit from any future gains in company and share value and any distributions paid to shareholders as determined by management." *See* ***Exhibit "4"*** annexed hereto and incorporated by reference to this Complaint ("July 8, 2024 update to investors."). There were no such gains or distributions that would or could ever inure to the benefit of holders of the Notes.

89. Santarelli and the Wyoming Norada Defendants knew such benefits would not be forthcoming because a significant amount of investors' funds were never invested at all but instead personally squandered by Santarelli or used to facilitate conveyances of virtually worthless assets that Norada Capital and its progeny could mark-up to feign holding assets of value.

90. At this time, Santarelli on behalf of the Wyoming Norada Defendants also confirmed that due to the purported conversion, there would no longer be "continued interest payments. You are a shareholder and benefit from potential future gains in share value, cash distributions, and redemptions from liquidity distribution events." *Id.*

91. At this time, Santarelli on behalf of the Wyoming Norada Defendants also stated

that the decision to suspend payments was a result of "thorough deliberation and analysis of market conditions, the cash distribution position of our investments, and our current financial position[.]" Santarelli further elaborated that "market conditions" meant "tight capital markets, slower-than-expected revenue growth with our portfolio businesses, and the overall cash position and distribution schedules of our portfolio businesses." Santarelli promised financial reports for the Notes would be provided in the coming weeks to determine company and share value. *Id*.

92. At this time, Santarelli on behalf of the Wyoming Norada Defendants also elaborated upon a half-baked plan to "redeem investor's shares as soon as it becomes financially feasible." Santarelli stated "[r]edemption is the repurchase of your equity as determined by the company. It is not something the investor can choose to do at their option. It is also not based on the Promissory Note maturity date prior to the conversion to equity." *Id*.

93. At this time, as to the liquidity of the shares, Santarelli on behalf of the Wyoming Norada Defendants also stated "[s]hares are not liquid. They can be redeemed by the company at any time or sold privately to another investor with the approval of Norada Capital." *Id*.

94. Around June 6, 2024, the Wyoming Norada Defendants failed to disclose material information to investors, including, but not limited to, the strong possibility of Norada Capital's default on the Notes and serious consideration of pausing all distributions to investors and converting the notes to equity. This is despite Santarelli admitting in an e-mail dated June 25, 2024 that the Wyoming Norada Defendants were "monitoring this trend *for a number of months* but our distributions would not scale up fast/soon enough to service our Notes as originally forecasted." (emphasis added)

95. Santarelli on behalf of the Wyoming Norada Defendants sent investors another e-mail update on July 29, 2024, in which he confirmed that Norada Capital "in its sole discretion"

made the conversion of the Notes to equity.

96. There, Santarelli confirmed "Equity is not liquid or assignable" and "equity investors are not vested with voting or management authority." *See* ***Exhibit "5"*** annexed hereto and incorporated by reference to this Complaint ("July 29, 2024 update to investors").

97. When asked if the family of the Wyoming Norada Defendants was going bankrupt, Santarelli responded that "No, it is not. After careful consideration and analysis, we implemented these changes to ensure our business's long-term stability and sustainability, benefitting all our investors." *Id*.

98. Santarelli issued another e-mail update on August 12, 2024 specific to the e-commerce business assets of Norada Capital. *See* ***Exhibit "6"*** annexed hereto and incorporated by reference to this Complaint ("August 12, 2024 e-mail update"). Santarelli communicated that the financial instruments of the e-commerce businesses were restricted and placed into an "almost entirely debt-free holding company" called "Omni." In this letter, Santarelli stated Norada Capital invested $12,250,000.00 into "various e-commerce-based investments" and that "Norada Capital owns 11.1193% of Omni's equity today."

99. The nonsense of this statement is inescapable. There was no and has been no disclosure to anyone as to who manages "Omni," where any of the Wyoming Norada Defendants sits in its capital stack, and why any of them are even invested in it. Further, Santarelli knew or should have known by August 2024 that the Notes were placed in violation of the Regulation D exemption previously claimed, and thus any holding of unregistered, "restricted" financial instruments could not be held indirectly or beneficially by any unaccredited investors. There were in fact unaccredited investors in the Notes that rendered the Regulation D exemption useless, thus turning the private placement of the Notes into a bona-fide public offering requiring full disclosure

to securities regulators.

100. To the extent funds were invested at all, the Tennessee Norada Plaintiffs are informed and believe that few, if any of the financial instruments invested in via the Ponzi scheme of the Notes were not registered with the SEC, Tennessee securities regulators or the securities authorities of any jurisdiction. Further, Santarelli's control positions within component companies created irreconcilable conflicts of interest among the Wyoming Norada Defendants. Defendant Norada Capital failed to comply with the prohibitions of solicitation of investments from unaccredited investors, which included public advertising and a publicly accessible website.

101. The Wyoming Norada Defendants utilized instrumentalities of interstate commerce in connection with unlawful placements and sales of unregistered securities in the form of the Notes.

102. In connection with the foregoing, the Wyoming Norada Defendants made or caused the Wyoming Norada Defendants to make material misrepresentations and omissions to the Tennessee Norada Plaintiffs and failed to disclose, or caused to fail to disclose, material facts upon which a reasonable investor would rely, including but not limited to disclosures regarding (a) the risk level of the Notes as unsuitable for any investor, (b) each Plaintiff's lack of suitability for such investments, (c) the control and dominion of Santarelli over the Wyoming Norada Defendants, (d) the lack of internal controls among the Wyoming Norada Defendants, (e) the misuse of funds intended for the Notes by Santarelli, (f) the inability of Norada Capital to claim a safe harbor under Regulation D due to its own misconduct and its association with "bad actors," and (g) the accuracy of financial information regarding component companies underlying the Notes.

103. The Tennessee Norada Plaintiffs are also informed and believe that the Wyoming Norada Defendants affirmatively knew those material misrepresentations and omissions were false

and misleading when made or failed to be made, and knew that the Tennessee Norada Plaintiffs and other investors did not realize that the risky and highly speculative nature of the underlying investments doomed any reasonable prospects to ever get their money back. Had any one of the Wyoming Norada Defendants even offered a scintilla of truth as to the financial condition of their Ponzi scheme or warned the Tennessee Norada Plaintiffs as to the true state of the Norada enterprise, none of the Tennessee Norada Plaintiffs would have purchased the Notes.

104. Even after the conversion of the Notes into equity, the Wyoming Norada Defendants brazenly continued to market promissory notes in Aspire Events, LLC to the Tennessee Norada Plaintiffs and other investors in the Notes.

105. In such cases, 17% interest and quarterly interest payments were promised, stating the company had roughly 1,900 paying members with a current valuation of $43 million.

106. On information and belief, the Tennessee Norada Plaintiffs assert that Aspire Events, LLC could not pay any investors 17% interest and that its valuation of $43 million was, is, and continues to be a sham.

107. On November 13, 2024, Norada Real Estate sent flyers to investors in the Notes for investment opportunities for a "protected return of 23%" in Turquoise Bay Resort in Englewood, Florida. Norada Real Estate apparently conducted this sale campaign in a last-ditch effort to keep Santarelli's Ponzi Scheme going. *See* ***Exhibit "7"*** (Turquoise Bay Promotion E-mail). Despite a small disclaimer at the bottom of the e-mail that this was only an offer from Aspire Events, LLC, the promotional e-mail was sent from a Norada Real Estate e-mail address. *Id.*

108. By the end of November 2024, virtually all communications regarding the Notes and equity of the Wyoming Norada Defendants had ceased.

109. On January 23, 2026, a consent judgment ("SEC Consent Judgment"), *annexed*

hereto as ***Exhibit "8"*** was filed in *SEC v. Santarelli*, Crim. No. 8:25-cv-002375-FWD-ADS (C.D. Cal) at Docket 1, ordering, among other things, that "Defendant shall pay disgorgement and ill-gotten gain, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Moreover, Santarelli is precluded from arguing that he did not violate the securities laws as alleged in the Complaint ("SEC Complaint"), to wit: Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77f, and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, in connection with the SEC's motion for disgorgement and/or civil penalties at any hearing help on such a motion. In addition, the Consent Judgment permanently restrains and enjoins Santarelli from violating several sections of the Securities Exchange Act of 1934 and the Securities Act of 1933. See ***Exhibit "8," supra.***

110. On or about September 8, 2025, in *United States vs. Santarelli*, Crim. No. 8:25-cr-00174-FWS-1 (C.D. Cal)., Santarelli was charged with one count of Wire Fraud substantially related to the allegations in this Complaint. On October 20, 2025, pursuant to a sealed plea agreement, Santarelli pled guilty to this charge. See Docket 8 and Docket 15. The criminal information filed in this matter is annexed hereto as ***Exhibit "9."***

## ANY SAFE HARBOR PROVISIONS FOR FORWARD-LOOKING STATEMENTS ARE INAPPLICABLE

111. Any statutory safe harbor for forward-looking statements under state and federal securities laws does not apply to the Wyoming Norada Defendants with regard to the Notes. First, the representations made by the individuals and acting on behalf of the Wyoming Norada Defendants with respect to the risks of the Notes were not forward-looking statements when they were made or offered to the Tennessee Norada Plaintiffs, but instead statements made in

furtherance of an overall fraud.

112. To the extent that any such statements were forward-looking statements, other than meaningless "boilerplate," there were no meaningful "cautionary statements" or disclosures identifying important factors that could cause actual results from each of the component investments in the Norada Capital portfolio to differ materially from those in the forward-looking statements. Further, the safe harbor does not protect against material omissions, in light of the Wyoming Norada Defendants' violations and aiding of violations of Regulation D.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 10(B)**
**OF THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5**

113. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

114. This cause of action is pled in the alternative to the extent permitted by law.

115. At all relevant times, the Wyoming Norada Defendants (a) made or caused to make material misrepresentations regarding the risk of the Notes and/or failed to disclose the risk of the investments supporting the Notes, and thus the Notes; (b) knew that the underlying investments of the Notes, and thus the Notes, were risky and highly speculative when the statements and/or omissions were made upon which a reasonable investor would rely; (c) failed or caused to fail to disclose conflicts of interest in ownership and control by Santarelli and Fossum among the Wyoming Norada Defendants, (d) engaged in the aforementioned acts in connection with the placement and sale of unregistered securities; (e) knew that each of the Tennessee Norada Plaintiffs reasonably would rely or relied on these material misrepresentations and/or omissions in connection with their decisions to purchase or hold financial interests in the Notes; (f) knew that the Tennessee Norada Plaintiffs' reliance led to the loss of substantial sums of their respective

investments; and (g) knew that Defendants' misrepresentations and omissions were made with requisite scienter and intended to and did induce the Tennessee Norada Plaintiffs' reliance with the intent to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

116. At all relevant times, the Wyoming Norada Defendants failed to disclose material facts to the Tennessee Norada Plaintiffs and acted with requisite scienter with such disclosure failures, including but not limited to (a) Fossum's status as a "bad actor," (b) that Santarelli was a failure as an investment professional and in fact previously filed for bankruptcy; (c) that Santarelli was previously ordered to cease and desist from offering nonexempt, unregistered offerings of securities due to illegally soliciting an unaccredited investor and failing to disclose his bankruptcy; and (d) Santarelli's company 360 Enterprises d/b/a Norada Real Estate previously filed for bankruptcy.

117. The Wyoming Norada Defendants also made or caused to make material misrepresentations and/or omissions regarding how much revenue Norada Capital's underlying investments were generating because stating otherwise would have revealed that the Notes were unsuitable for anyone. Also undisclosed was the insufficient capitalization of those component companies of the Notes and thus the Notes to generate any return, along with the lack of any reasonable factual bases for Santarelli's "track record," the outsized returns and "bonus" promised to investors in the Notes.

118. Further, each of the Wyoming Norada Defendants knew that Norada Capital was acting as an unregistered broker-dealer and investment adviser when federal securities laws required its registration as such. But at every turn and in every communication with The Tennessee Norada Plaintiffs, the Wyoming Norada Defendants stood by and did nothing.

119. The Wyoming Norada Defendants also intentionally failed to disclose that Norada

Capital's operations were being conducted in violation of state and federal securities laws given that Norada Capital should have been registered as a broker-dealer or investment adviser to conduct its business, but it was not. They each acted with scienter as to these failures because had they actually undertaken the disclosures they were supposed to make, their Ponzi scheme could never have garnered funds from unsuspecting investors.

120. Through these and other misstatements and omissions, the Wyoming Norada Defendants, directly and indirectly, through the instrumentalities of interstate commerce, engaged in a continuous course of causing and making misrepresentations and omissions regarding the Notes for the purpose of deceiving and misleading investors. Included in these misrepresentations were misstatements as to reliance on Regulation D as an exemption from registration when that exemption could not be invoked. The Wyoming Norada Defendants, each also failed to disclose that the Notes and the investments supposedly supporting them were merely the pretext for the operation of a Ponzi scheme to fund compulsive spending by Santarelli.

121. Each of the Wyoming Norada Defendants knew of Santarelli's misuse of investors' funds yet stood in silence and failed to disclose such conduct to the Tennessee Norada Plaintiffs or warn them.

122. At the time of these misrepresentations and key omissions, the Tennessee Norada Plaintiffs were ignorant of the riskiness and speculative nature—if not the inherent worthlessness—of the investments that the Wyoming Norada Defendants were handling yet misrepresented to induce purchases of the Notes.

123. Had the Tennessee Norada Plaintiffs known about the extreme risks involved, Santarelli's previous cease and desist orders and prior bankruptcy filings, Fossum's status as a "bad actor," and/or that Santarelli was running a Ponzi scheme to fund excessive spending, each

one of the Tennessee Norada Plaintiffs would have never invested in the unregistered securities.

124. The Tennessee Norada Plaintiffs further aver that the conduct of each of the Wyoming Norada Defendants was so blatantly reckless as to misstatements and omissions to investors in the Notes that this Court may infer they each acted with scienter as a matter of law.

125. Based on the foregoing, each of the Wyoming Norada Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As a direct and proximate result of the wrongful conduct, the Tennessee Norada Plaintiffs suffered damages of at least $1,805,000, the exact amount of which will be proven at trial.

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against the Wyoming Norada Defendants Except Norada Capital)**

126. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

127. This cause of action is pled in the alternative to the extent permitted by law.

128. As alleged herein, Norada Equity, Norada Capital Ecommerce Fund I LLC; Norada Capital Crypto Fund I LLC; Norada Theatrical Productions LLC; Norada Real Estate Funding LLC; and Norada Capital Real Estate Fund I, LLC (the “Norada Control Defendants”) were control persons of Norada Capital within the meaning of Section 20(a) of the Exchange Act. At all relevant times, each of the Norada Control Defendants had the power to influence and control the decision making of Norada Capital, including but not limited to Norada Capital’s dealings with the Tennessee Norada Plaintiffs and the equity conversion done in violation of governing corporate documents. In particular, each of the Norada Control Defendants had direct involvement in the operations of Defendant Norada Capital and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercise the same.

Also, as set forth above, the Wyoming Norada Defendants committed primary violations of Section 10(b) and Rule 10b-5 by the acts and omissions alleged herein. By virtue of their control positions of entities intimately entwined in the Norada Ponzi scheme, the Norada Control Defendants are each liable for the Tennessee Norada Plaintiffs' losses in the Notes pursuant to Section 20(a) of the Exchange Act.

**THIRD CAUSE OF ACTION**
**VIOLATION OF TENN. CODE ANN. §§ 48-1-121 AND 48-1-122(a)**

129. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

130. This cause of action is pled in the alternative to the extent permitted by law.

131. The Tennessee Securities Act prohibits fraudulent statements, schemes, actions, or omissions in connection with the offer, sale, or purchase of securities (Tenn. Code Ann. § 48-1-121) and imposes liability upon individuals who violate this prohibition. (§ 48-1-122(a)).

132. The Notes are securities under the Tennessee Securities Act.

133. The Wyoming Norada Defendants made or caused to make untrue statements of fact, or omitted material facts, to the Tennessee Plaintiffs in connection with the offer and sale of the Notes. The Wyoming Norada Defendants each knew these statements were false each and every time they were made or caused to be made to the Tennessee Plaintiffs.

134. The Plaintiffs had no reasonable means of discovering that statements made or caused to be made by the Wyoming Norada Defendants were false. Among other things, (a) Defendants' misrepresentations and omissions concerning Norada Capital's financial conditions, (b) Santarelli's qualifications for leading such an investment, (c) Santarelli's control status of component companies of the Notes, (d) Santarelli's previous bankruptcies/cease and desist orders

issued against him and (e) Fossum's status as a "Bad Actor" were each a substantial factor in the Tennessee Norada Plaintiffs' investment decision. Indeed, these false and misleading statements induced the Tennessee Norada Plaintiffs to purchase the Notes.

135. The Wyoming Norada Defendants also engaged in acts, practices, and business operations for the purpose of defrauding or deceiving the Tennessee Plaintiffs and for the purpose of unlawfully converting the Tennessee Plaintiffs' funds.

136. The Wyoming Norada Defendants' material misrepresentations and misconduct directly and proximately caused the Plaintiffs to suffer substantial financial harm. As a result, the Plaintiffs have suffered the loss of their investments entrusted to Defendants.

137. Defendants willfully engaged in the above conduct.

138. The Plaintiffs seek an award of compensatory damages against Defendants and each of them, in an amount to be determined at trial, but no less than $1,805,000, plus interest and an award of reasonable attorneys' fees and costs, pursuant to Tenn. Stat. Ann. § 48-2-122(f). In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of these Defendants, the Plaintiffs also seek punitive damages in an amount sufficient to punish and deter them in the maximum amount provided under applicable law.

**FOURTH CAUSE OF ACTION**
**CONTROL PERSON AND MATERIAL AID LIABILITY UNDER THE TENNESSEE SECURITIES ACT**
**(Against Norada Control Defendants)**

139. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

140. This cause of action is pled in the alternative to the extent permitted by law.

141. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs.

142. Tenn. Code Ann. § 48-1-122(g) provides: Every person who directly or indirectly controls a person liable under this section, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

143. The Norada Control Defendants directly or indirectly controlled Norada Capital and materially aided in the offer and sale of the securities at issue, including but not limited to preparing, approving, or disseminating offering materials, directing investor communications, controlling bank accounts, and supervising the receipt and use of investor funds.

144. Each of the Norada Control Defendants was a manager, officer, entity or member performing similar functions within Norada Capital and exercised actual power and control over the operations and the securities offerings at issue.

145. The Norada Control Defendants cannot sustain their statutory burden to demonstrate that they did not know, and in the exercise of reasonable care could not have known, of the facts giving rise to liability. To the contrary, they had actual knowledge of, or were reckless in not knowing of, the material misstatements, omissions, misuse of investor funds, and unlawful conduct alleged herein.

146. Each of the Norada Control Defendants had knowledge of these publications and

lack just and reasonable grounds to believe the statements therein were true or that the omissions of facts were not material. Each of them is liable accordingly under Tennessee's laws regarding control persons.

147. Accordingly, they are jointly and severally liable for rescission, damages, interest, costs, and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

148. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

149. To the extent required, this cause of action is expressly pled in the alternative.

150. The Wyoming Norada Defendants made or caused to make representations to the Tennessee Norada Plaintiffs regarding material facts, including the risks and suitability of certain investments.

151. The Tennessee Norada Plaintiffs are informed and believe that the representations made regarding the risks and suitability of such investments for the Tennessee Norada Plaintiffs were false and/or that the Wyoming Norada Defendants omitted material information regarding Santarelli's qualifications for managing millions of dollars in investments, Santarelli's lack of control status of Mastermind Businesses, Santarelli's misuse of investor funds, as well as Fossum's capacity to act as a Chief Financial Officer when federal securities laws prohibited him from doing so given his "bad actor" status.

152. The Tennessee Norada Plaintiffs are informed and believe that the representations were made or caused to be made by the Wyoming Norada Defendants through Santarelli and others regarding the risks and suitability of the Notes without reasonable grounds for believing them to be true, and more likely than not made to further a Ponzi scheme.

153. At the time each of the Tennessee Norada Plaintiffs invested in the Notes, they were unaware of the falsity of the misrepresentations and/or omissions and acted with justifiable reliance on the truth of each and every one of those representations made or caused to be made by the Wyoming Norada Defendants.

154. In engaging in the alleged misconduct, the Wyoming Norada Defendants made or caused to make misrepresentations and statements of material facts, and omitted or caused to omit to state material facts regarding the risk and suitability of the investments, all of which were necessary to inform the Tennessee Norada Plaintiffs of all material facts required to make informed decisions regarding the purchase of the unregistered securities.

155. As a direct and proximate result of the misrepresentations and omissions alleged, The Tennessee Norada Plaintiffs have suffered money damages in excess of $1,805,000 in the aggregate, the exact amount of which will be proven at trial.

**SIXTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**

156. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

157. To the extent required, this cause of action is expressly pled in the alternative.

158. The Wyoming Norada Defendants each had a fiduciary duty to act in the utmost good faith for the benefit of the Tennessee Norada Plaintiffs given their special knowledge of the business conduct of Santarelli and others. Specifically, Norada Capital was required to adequately advise the Tennessee Norada Plaintiffs regarding the risks of their investments in the Notes.

159. The Wyoming Norada Defendants breached their fiduciary duties owed to the Tennessee Norada Plaintiffs including, but not limited to their (a) failure to or causing the failure to warn the Tennessee Norada Plaintiffs of financial risks inherent in such speculative investments;

(b) failures to acknowledge the Tennessee Norada Plaintiffs' concerns and directions when the Tennessee Norada Plaintiffs and other investors expressed concerns about the status of their Notes and the underlying investments under the control or custody of the Wyoming Norada Defendants; (c) causing failures to obtain appropriate subscription information from the Tennessee Norada Plaintiffs given the risk of an investment in the Notes; (d) causing failures to protect the Tennessee Norada Plaintiffs' financial interests and (e) failing to reject association with Fossum given his status as a "Bad Actor."

160. The actions of Norada Capital were reckless, risky, and unwarranted, especially when considering the Tennessee Norada Plaintiffs' investment objectives and risk tolerances.

161. The management of the Tennessee Norada Plaintiffs' funds in the component companies of the Notes, to the extent those funds were even invested in them despite statements to the contrary, fell below any reasonable standard of care in the investment management industry and caused significant financial losses to the Tennessee Norada Plaintiffs.

162. As a direct and proximate result of the individual and entity the Wyoming Norada Defendants' breaches of fiduciary duties, the Tennessee Norada Plaintiffs have suffered money damages in excess of $1,805,000 in the aggregate, the exact amount of which will be proven at trial.

**SEVENTH CAUSE OF ACTION**
**FRAUD**

163. The Tennessee Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

164. To the extent required, this cause of action is expressly pled in the alternative.

165. In offering and selling the securities referred to herein, the Wyoming Norada Defendants made or caused to make untrue statements and/or misrepresentations and omissions of

material facts to the Tennessee Norada Plaintiffs. Those misstatements and omissions are those described in the previous paragraphs of this Complaint.

166. The Wyoming Norada Defendants had a duty to disclose these material facts to the Tennessee Norada Plaintiffs as a result of their fiduciary roles and common control.

167. The Wyoming Norada Defendants had a further duty to disclose these material facts to investors such as the Tennessee Norada Plaintiffs since they each undertook steps or caused to make other affirmative representations about these matters, and were thus bound to make full and fair disclosure of all material facts regarding their respective businesses and financial affairs.

168. The Wyoming Norada Defendants misrepresented, suppressed, and concealed material facts, or caused the misrepresentation, suppression and concealment of material facts with the intent to induce reliance and to defraud the Tennessee Norada Plaintiffs.

169. At all relevant times, the Tennessee Norada Plaintiffs were unaware of the material facts that were caused to be misrepresented, suppressed, and concealed by the Wyoming Norada Defendants. If the Tennessee Norada Plaintiffs had been aware of such suppressions, misrepresentations or concealments, they would not have never invested in the Notes or would have taken further steps prior to this lawsuit to protect their interests.

170. As a direct and proximate result of the intentional and fraudulent misrepresentations, suppressions, and concealments of material facts caused by the Wyoming Norada Defendants, the Tennessee Norada Plaintiffs have suffered, and continue to suffer money damages in excess of $1,805,000 the exact amount of which will be proven at trial.

171. The conduct of each of the Wyoming Norada Defendants as described herein was despicable, willful, fraudulent, oppressive, and malicious so as to justify an award of exemplary or punitive damages to deter further misconduct.

## EIGHTH CAUSE OF ACTION
## SET ASIDE FRAUDULENT TRANSFERS OF ASSETS

172. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein.

173. To the extent required, this cause of action is pled in the alternative.

174. The Tennessee Norada Plaintiffs are informed and believe that the Wyoming Norada Defendants, at the instruction of Santarelli, caused large amounts of corporate funds and/or other corporate assets gathered from investors and intended to benefit holders of Notes to be transferred to or among each one of them.

175. The Tennessee Norada Plaintiffs are also informed, and have reason to believe that funds transferred to through the Wyoming Norada Defendants were ultimately transferred to Santarelli himself, wherein they were frittered away on excessive personal spending that may have exceeded 4,000 transactions per month on personal credit cards, which is an average of over 133 per day, or one every 12 minutes of the day.

176. The Tennessee Norada Plaintiffs are informed and believe and thereon allege that the transfer(s) were made with an actual intent to hinder, delay, or defraud the Tennessee Norada Plaintiffs in the collection of their damages and/or return of funds to which the Tennessee Norada Plaintiffs were and are legally entitled.

177. The Tennessee Norada Plaintiffs are informed and believe and thereon allege that, at the time the alleged transfers were made, the Wyoming Norada Defendants at Santarelli's instruction intended in the future to engage in this conduct in breach of relevant agreement(s) with the Tennessee Norada Plaintiffs, as described more fully above, and for which Norada Capital ultimately intended to render itself judgment-proof.

178. The Tennessee Norada Plaintiffs are informed and have reason to believe that the

Wyoming Control Defendants reasonable bases to know or comprehend that Norada Capital (a) was operating a "boiler room," (b) received transaction-based compensation in connection with the placement of Notes, (c) had reason to know that the Notes were part of a Ponzi scheme and (d) that Norada Capital received commissions which were in fact derived from Ponzi proceeds, or at the very least derived through repeated violations of state and federal securities laws.

179. The Tennessee Norada Plaintiffs are informed and believe and thereon allege that Defendant Norada Capital received no money or reasonably equivalent value in exchange for the aforementioned transfers and at the time of the transfers of funds and other assets, Defendant Norada Capital to Norada Equity, Inc., Norada Capital Ecommerce Fund I, Norada Capital Crypto Fund I, Norada Theatrical Productions, Norada Real Estate Funding, and Norada Capital Real Estate Fund I did not provide reasonably equivalent value in exchange for the transferred assets.

180. The Tennessee Norada Plaintiffs are informed and believe and thereon allege that Defendant Norada Capital to Norada Equity, Norada Ecommerce, Norada Crypto, Norada Theatrical, Norada Real Estate Funding, and Norada Capital Real Estate Fund received assets, including but not limited to those described above, with knowledge of an intention to: (1) hinder, delay, or defraud the collection or payment of The Tennessee Norada Plaintiffs' aforementioned damages; and (2) further breach relevant agreement(s) with The Tennessee Norada Plaintiffs, as described more fully above.

181. The Tennessee Norada Plaintiffs are informed and have reason to believe the Wyoming Norada Defendants each received assets from the Tennessee Norada Plaintiffs, either directly or indirectly, knowing such funds were procured through fraud through Norada Capital. The Wyoming Norada Defendants also knew of the purloined nature of the funds received given that Santarelli had not met funding obligations to Aspire and Collective. Thus, each of the

Wyoming Norada Defendants ultimately received such funds with knowledge of an intention to: (1) hinder, delay, or defraud the collection or payment of the Tennessee Norada Plaintiffs' aforementioned damages; and (2) further breach relevant agreement(s) with the Tennessee Norada Plaintiffs, as described more fully herein.

182. The Tennessee Norada Plaintiffs are informed and believe and thereon allege that the Wyoming Norada Defendants were each aware of or had reason to be aware of the fraudulent nature of each and every transfer(s). As a result of the fraudulent asset transfers alleged herein, Defendant Norada Capital has been rendered an empty shell, without any assets, funds, or business operations. All of the fraudulent asset transfers alleged herein are voidable under the Uniform Fraudulent Transfer Act, Wyo. Stat. §§ 34-14-201, et seq., the common law of the State of Wyoming and to the extent applicable, parallel laws regarding such matters in force in Tennessee.

183. All of the fraudulently transferred assets and funds must be equitably traced and returned to Defendant Norada Capital for the benefit of the Tennessee Norada Plaintiffs, plus interest.

**NINTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Defendant Norada Capital)**

184. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein.

185. To the extent required, this cause of action is expressly pled in the alternative.

186. The Tennessee Norada Plaintiffs and Norada Capital entered into the Notes. Under the terms of the Notes, Norada Capital was to pay Tennessee Norada Plaintiffs monthly interest in exchange for use of their funds until the Notes' maturity dates, subject to other conditions enumerated in the Notes and, when provided, PPMs for the Notes.

187. The Tennessee Norada Plaintiffs performed under the terms of the Notes by furnishing the funds. Norada Capital breached the promissory notes by automatically converting outstanding balance into equity because none of the Tennessee Norada Plaintiffs' notes were in default for a period lasting more than three months pursuant to operative language of the respective Notes.

188. The Tennessee Norada Plaintiffs sustained damages as a result of Norada Capital's failure to perform as provided under operative language of the respective Notes.

**TENTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Defendant Norada Capital Management LLC)**

189. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein.

190. To the extent required, this cause of action is pled in the alternative.

191. The Tennessee Norada Plaintiffs and Norada Capital are parties to the Agreement that required the Tennessee Norada Plaintiffs to furnish funds and for Norada Capital to return the Tennessee Norada Plaintiffs' funds in addition to specified interest and bonus payments.

192. The Tennessee Norada Plaintiffs have performed all conditions, covenants, and promises required to be performed on their part. The Tennessee Norada Plaintiffs engaged in their services in good faith and timely sent their payments to Norada Capital.

193. Norada Capital violated its duty to act in good faith by directing the Tennessee Norada Plaintiffs' investments into non-revenue generating enterprises, which was inconsistent with the parties' common purpose and justified expectations based on the Notes.

194. As a direct and proximate result of Norada Capital's wrongful acts alleged herein, the Tennessee Norada Plaintiffs have and continue to suffer damages.

**ELEVENTH CAUSE OF ACTION**
**ACCOUNTING**

195. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein.

196. To the extent required, this cause of action is pled in the alternative.

197. The Tennessee Norada Plaintiffs and Norada Capital had a fiduciary relationship based upon execution of the Notes. Norada Capital breached its fiduciary duties to the Tennessee Norada Plaintiffs based upon the fraudulent misrepresentations and omissions that resulted in losses of the Tennessee Norada Plaintiffs' investments.

198. Norada Capital's breaches of fiduciary duties were with respect to the Notes, property in which the Tennessee Norada Plaintiffs have an interest. The Tennessee Norada Plaintiffs demand an accounting that confirms whether any of the money due and owing to them remains in Norada Capital's custody and/or control; identifies the recipients of any of the funds disbursed from Norada Capital; and provides all evidence concerning the disbursements and the disbursed amounts.

199. To date, Norada Capital has not provided this information.

200. The Tennessee Norada Plaintiffs have no adequate remedy at law.

201. Accordingly, Tennessee Norada Plaintiffs now demand that Norada Capital accounts for all of their actions relating to the Note amounts and provide The Tennessee Norada Plaintiffs with all of the records in their possession relating to same.

**TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

202. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein. To the extent required, this cause of action

is pled in the alternative. The Tennessee Norada Plaintiffs conferred a benefit to the Wyoming Norada Defendants via investment through the Notes. The Wyoming Norada Defendants voluntarily accepted and retained the benefits conferred.

203. The circumstances are such that it would be inequitable for the Wyoming Norada Defendants to retain the benefits without paying the value thereof to the Tennessee Norada Plaintiffs.

## REQUEST FOR APPOINTMENT OF RECEIVER FOR THE NORADA CONTROL DEFENDANTS

204. The Tennessee Norada Plaintiffs incorporate herein by reference all preceding paragraphs of the Complaint as if set forth fully herein.

205. Over $1,805,000 in the aggregate of The Tennessee Norada Plaintiffs' funds have been dissipated. According to the SEC, over $60 million of funds of public customers has been lost in this Ponzi scheme

206. As a consequence of Norada Capital's failure to make principal, interest, and/or other payments when due under the Notes, Norada Capital is in default of the terms of the Notes.

207. The Tennessee Norada Plaintiffs' funds have been wasted and mismanaged such that the Tennessee Norada Plaintiffs are without access to the funds, nor can they ascertain the current location of the funds.

208. On information and belief, the Wyoming Norada Defendants have or will destroy business records and communications to hide their wrongful acts given their utter lack of internal controls.

209. There is no justifiable business reason for the business misconduct in this case.

210. The Tennessee Norada Plaintiffs seek the appointment of a receiver to manage the affairs of each of the Norada Control Defendants pursuant to Wyoming Stat. Ann. § 1-33-101(a)(ii)

and/or § 1-33-101(a)(iii) and to take all necessary action consistent with Wyoming law, including but not limited to dissolution of each of them.

211. Pursuant to Wyoming Stat. Ann. § 1-33-104, the receiver under control of the Court, may take possession of property, make transfers, and generally do acts respecting the property as the Court may authorize.

212. The Norada Control Defendants are guilty of fraud and gross mismanagement in their conduct of business with one another insofar and they have each converted, embezzled, or otherwise improperly received funds from Norada Capital and otherwise used Norada Capital as a platform to steal from the Tennessee Norada Plaintiffs. The Tennessee Norada Plaintiffs, as interested parties, are threatened with material losses and injuries should the Norada Control Defendants remain in control of any of their assets.

213. As a direct and proximate result of ongoing breaches of duties owed to the Tennessee Norada Plaintiffs, the Tennessee Norada Plaintiffs have suffered and shall continue to suffer irreparable harm, absent the appointment of a receiver over the Norada Control Defendants.

214. The appointment of a receiver during the pendency of these proceedings is necessary to conserve, preserve, protect, and administer assets in which the Tennessee Norada Plaintiffs have an interest.

215. The Tennessee Norada Plaintiffs request an order pursuant to Wyo. Stat. Ann. § 1-33-101(a)(ii) and/or 1- 33-101(a)(iii) appointing a receiver to immediately take possession and control of assets of the Norada Control Defendants.

**JURY TRIAL REQUESTED**

216. Tennessee Norada Plaintiffs request a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Tennessee Norada Plaintiffs respectfully pray for judgment as follows:

1. The immediate appointment of a receiver over Norada Capital to protect the interests of the Tennessee Norada Plaintiffs;

2. An accounting of their funds;

3. Compensatory damages and/or other monetary relief in excess of $1,805,000 in the aggregate as provided under applicable state and federal laws, the exact amount of which will be proven at trial;

4. For exemplary or punitive damages, in an amount according to proof at trial;

5. For reasonable attorneys' fees and costs;

6. For pre- and -post-judgment interest; and

7. All other relief deemed just, proper, and equitable by the Court.

Dated: March 3, 2026

**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

*/s/ Robert V. Cornish Jr.*
ROBERT V. CORNISH JR. (WSB# 6-3898)
680 South Cache Street, Suite 100, P.O. Box 12200
Jackson, WY 83001
Office: (307) 264-0535
rcornish@rcornishlaw.com

*Attorney for Mark Sanders, Karen Krywy-Sanders, beneficiary of the Karen Krywy-Sanders IRA, Chad Beebe, Matthew C. Motsko, Dewayne Cothron and WD60 LLC (the "Tennessee Norada Plaintiffs")*